**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION**

| | | |
|---|---|---|
| **DANNY OWENS,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **NO. 1:17-cv-00105** |
| | ) | |
| **GRADY PERRY, Warden,**[1] | ) | **JUDGE CAMPBELL** |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM

Danny Owens is currently serving a sentence of twenty years in prison based on his April 12, 2012 conviction by a Lawrence County, Tennessee jury of second-degree murder. On November 30, 2017, he filed his pro se petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. No. 1.) Respondent thereafter filed an answer to the petition (Doc. No. 12) and the state court record (Doc. Nos. 10, 14), and Petitioner filed a reply to Respondent's answer (Doc. No. 18).

This matter is ripe for the Court's review, and the Court has jurisdiction. Respondent does not dispute that Petitioner's petition is timely, that this is his first Section 2254 petition related to this conviction, and that the claims of the petition have been exhausted. (Doc. No. 12 at 1–2.)

Having reviewed Petitioner's arguments and the underlying record, the Court finds that an

---

[1] On August 14, 2019, Petitioner filed a motion to substitute Grady Perry for Tammy Ford as Respondent in this action, based on his transfer to South Central Correctional Facility where Perry is Warden. (Doc. No. 22.) As Petitioner properly notes in his motion, Rule 2(a) of the Rules Governing § 2254 Cases requires that the petition "name as respondent the state officer who has custody." *See also Rumsfeld v. Padilla*, 542 U.S. 426, 434 (2004) (citing 28 U.S.C. §§ 2242, 2243). Accordingly, Petitioner's motion will be granted by separate order, and the Clerk will be directed to substitute Perry as Respondent in this case.

evidentiary hearing is not required. As explained below, Petitioner is not entitled to relief under Section 2254, and his petition will therefore be denied.

## I. PROCEDURAL HISTORY

Petitioner was indicted on August 27, 2010, for the first-degree murder of his wife, Vicki Owens. (Doc. No. 10-1 at 9–10.) Following a jury trial, Petitioner was convicted of the lesser included offense of second-degree murder on April 12, 2012. (*Id.* at 165–66.) The trial court sentenced Petitioner to twenty years in prison. (*Id.* at 173–79.)

On direct appeal, Petitioner argued that: (1) the evidence at trial was insufficient to support his conviction; (2) the trial court erroneously ruled on multiple evidentiary issues; and (3) the trial court committed error in sentencing Petitioner. (Doc. No. 10-24 at 9.) The Tennessee Court of Criminal Appeals concluded that "the evidence, though circumstantial, is sufficient to sustain Owens's conviction for second degree murder" (Doc. No. 10-26 at 29); that no evidentiary errors had been committed (*id.* at 16–28); and, that the sentence imposed was not excessive. (*Id.* at 31–34.) *See State v. Owens*, No. M2012-02717-CCA-R3CD, 2014 WL 1173371 (Tenn. Crim. App. Mar. 24, 2014). The Tennessee Supreme Court denied discretionary review on September 25, 2014. (Doc. No. 10-28.)

Petitioner filed a pro se petition for post-conviction relief on November 5, 2014. (Doc. No. 10-29 at 6–20.) Following the appointment of counsel and an evidentiary hearing, the post-conviction trial court denied relief. (Doc. No. 10-29 at 38–43.) Petitioner filed an appeal from the denial of post-conviction relief, raising the single issue of whether his trial counsel was constitutionally ineffective for failing to object to witness testimony on two occasions. (Doc. No. 10-34 at 13.) The Tennessee Court of Criminal Appeals affirmed the denial of post-conviction relief. (Doc. No. 10-36); *Owens v. State*, No. M2016-02068-CCA-R3-CD, 2017 WL 3836022 (Tenn. Crim. App. Aug. 31, 2017). Petitioner did not seek permission to appeal to the Tennessee

Supreme Court. He filed his pro se petition under Section 2254 in this Court on November 30, 2017.

## II. STATEMENT OF FACTS

As the Tennessee Court of Criminal Appeals noted, "[t]he defense theory at trial was that the victim had committed suicide," and the jury rejected this theory "[d]espite the fact that there was conflicting evidence" regarding whether she died by suicide or by homicide. *State v. Owens*, 2014 WL 1173371, at *25. That court's 2017 decision on Petitioner's post-conviction appeal contains a concise summary of its more expansive recitation on direct appeal of the state's proof at trial. That summary is set out below, followed by the summary of the defense's proof at trial contained in the Court of Criminal Appeals' 2014 decision on direct appeal, and the summary of the post-conviction evidence contained in the 2017 decision.

As to the state's proof at trial,

[L]aw enforcement officers responded to a deceased-person call at the Petitioner's residence on February 8, 2009, where they discovered the victim's body sitting in a rocking chair in the living room. A revolver was found near the victim's body, and a single bullet had entered the victim's right cheek, causing multiple wounds to her face, shoulder, and arm. The Petitioner told the officers that the victim had committed suicide, explaining that the victim suffered with painful medical conditions and had confronted him about having an affair. The victim suffered from diabetes, arthritis, knee problems, and stress fractures in her feet, for which she was undergoing treatment and taking medications, but her health had never kept her from working. A few days before her death, the victim told her adult daughter that she believed the Petitioner was having an affair. The victim had complained about the Petitioner's infidelity on other occasions but had never appeared suicidal.

Two days before the victim's death, while the victim's mother and the victim were talking on the telephone, the victim's mother overheard the Petitioner tell the victim, "I bought myself a [.]357.... I'm going to kill your God d*** ass." The day before her death, the victim was in a "very good" mood and was buying Valentine's gifts. Also, the victim was "really looking forward" to her son's wedding in May and had requested vacation time from her employer to attend the wedding in Florida.

The Friday before her death, the victim told one of her co-workers, Melba McKey, that she was going to confront the Petitioner about his affair. Ms. McKey had known the victim for twelve years and had seen physical signs of her turbulent marriage, including bruises on her neck and arm. When she asked the victim about the bruises that resembled fingerprints on her neck, the victim said that the Petitioner had choked her. The victim's supervisor also had worked with the victim for twelve years and had observed bruises on the victim's wrists and arms on several occasions.

[Several years earlier,] Deputy Donald Ward with the Giles County Sheriff's Department was dispatched to the Petitioner's residence on June 22, 2003, after a neighbor reported a domestic disturbance between the victim and the Petitioner. He observed that the victim had an injury inside her mouth on her lower lip, a scratch under her left jaw, and a swollen right wrist. Deputy Ward read a victim's rights form to the victim and left a copy with her.

A Smith & Wesson .357 magnum revolver containing four unspent rounds and one spent round was found near the victim's body. The investigating detective, who photographed the gun as he opened the cylinder, noticed that the top chamber, located underneath the hammer, had an unfired round and that a spent round was in the chamber to the left of the unfired bullet. He explained that in order for a live round to be underneath the hammer of the gun, the trigger would have to be pulled again, which would cause a second spent cartridge to be in the gun; or the hammer would have to be manually pulled again; or the cylinder would have to be taken out, rotated, and put back into the gun. A Tennessee Bureau of Investigation (TBI) agent, an expert in firearms examination and identification, examined the revolver and noted that it had a large frame, making it heavy, and that the spent cartridge would have ended up underneath the hammer unless the gun was manipulated. According to the agent, it would take human manipulation for the spent cartridge to end up one cylinder to the left of the hammer.

During an interview with another TBI agent, the Petitioner admitted that he had had several affairs and that, after the victim's death, he "might have" left a message on the answering machine of a woman he had previously dated, asking if she would go out with him now that the victim was dead. According to the Petitioner, the victim had extensive pain in her arms and legs and had been prescribed several medications. However, he never told the TBI agent that the victim was suffering from depression or any mental illness.

Although the medical examiner was unable to determine if the victim's manner of death was homicide or suicide, he noted that the gunshot wound was a close range wound that was angled, rather than perpendicular to the surface, and opined that the wound was unusual because of its location and the direction of the bullet path. He said that the gun found at the scene was heavy and would have been difficult for the victim to hold to produce the type of injury she suffered.

*Owens v. State*, 2017 WL 3836022, at *1–2 (internal citations omitted).

The defense's proof at trial was summarized by the Court of Criminal Appeals as follows:

Charles Hardy, a special agent with the TBI who worked at the Nashville Crime Laboratory, was declared an expert in the field of serology and DNA analysis. Agent Hardy testified he tested soap from the bathroom sink, a rag from the washing machine lid, Owens's clothing, a hand towel from the storage building, a washcloth from the northwest bathroom, a swab from the bathroom sink, a washcloth and red rag from Owens, and a revolver from the living room for DNA. He found that the washcloth from the bathroom and the swab from the kitchen sink contained Owens's blood. He stated that the revolver contained such limited DNA that he was unable to obtain a DNA profile that belonged to a particular individual.

Linda Littlejohn, a special agent forensic scientist with the TBI, was declared an expert in the field of microanalysis of fibers. She stated that she looked at the fibers that were collected from the victim's body and was asked to compare these fibers to the fibers from the towels collected from the garage and the victim's clothing. She stated that because all the fibers collected contained white cotton fibers, she was unable to determine the source of the fibers collected from the victim's body.

Tony Beard, a corporal with the Lawrence County Sheriff's Department, testified that he secured the crime scene until Detective Parker arrived. Corporal Beard stated that he kept a log of everyone who entered and exited the crime scene.

Robert Denton, a criminal investigator with the Lawrence County Sheriff's Department, testified that he assisted in collecting evidence and investigating the victim's death. He remembered that Owens sat at the kitchen table and appeared distraught at the scene. He did not observe Owens washing his hands or wiping his face.

Jeffrey Smith, one of the paramedics who arrived at the scene, testified that he noted the medications that had been prescribed to the victim, which included Trazodone, Gabapentin, Estradiol, Benicar, and Prevacid. He stated that Owens gave him information about the victim's medical history and showed him the victim's medicine bottles. Smith stated that Owens talked to him about the victim's leg and foot pain but did not tell him that the victim was suffering from mental illness or depression.

William and Deborah Wilkerson, nearby neighbors, testified that Owens was standing on his deck between 10:45 and 11:00 a.m. on February 8, 2009, and waved at them as they left for church. Deborah Wilkerson stated that she attended the victim's funeral and that Owens was "real[ly] sad" and was crying.

Brian Robinson, the funeral director at Neal's Funeral Home, testified that Owens paid for the victim's funeral. He said that although there was a dispute over where

the victim would be buried, Owens relented and allowed the victim to be buried at the location that her children had chosen. Robinson stated that during the meeting, Owens was "distraught[,]" "visibly upset[,]" and his eyes were red because he had been crying.

David Brundage, a retired employee with the Illinois State Police and the Marion County Forensic Services Agency, was declared an expert in the field of firearm identification. Brundage opined that if the gun had been fired by the victim, it would have been with her right hand because the entry wound was on the right side of her face. After looking at one of the crime scene photographs, he noted that there was a red substance, perhaps blood, on the fingers of the victim's right hand. He said he was unable to review the test results of the red substance on the victim's right hand because no test had been requested. Brundage stated that he was trained to mark the flutes of the cylinder of a revolver with a permanent marker before examining it in order to clearly identify the cartridge that was underneath the hammer. He stated that releasing the cylinder catch would cause the cylinder to move. After examining the autopsy report and photographs, Brundage opined that the Smith & Wesson revolver was fired one to three inches from the victim's head and had been fired at an angle.

On cross-examination, Brundage acknowledged that once the gun in this case was fired, the spent round would remain underneath the hammer unless human manipulation caused the cylinder to move. He also acknowledged that because the cylinder on this gun was stiff, it was unlikely that operating the release on the cylinder would cause the cylinder to fly open and rotate, especially if an officer was holding the revolver down when the cylinder was released. Brundage agreed that another way to identify the cartridge that was under the hammer was to carefully release the cylinder and visually see where the spent round was located.

Daniel Smith, whose mother lived near Owens, testified that he had a beer with Owens a couple of months after the victim's death. Shortly thereafter, law enforcement came to his house on a Saturday night and asked him to drive to the police station. When he told them that he could not drive because he was intoxicated, the officers drove him to the station, where they "tried to put words in his mouth" about Owens's involvement in the victim's death. He stated that officers Beard and Bartrum questioned him for approximately four or five hours before releasing him. . . .

*State v. Owens*, 2014 WL 1173371, at *10–12.

Petitioner's post-conviction petition alleged that his trial counsel was ineffective in failing to object to the introduction of testimony concerning prior allegations of domestic violence, when the trial court had ruled prior to trial that such statements would not be admissible. The testimony

at issue came from two witnesses, Deputy Donald Ward and Melba McKey. At the post-conviction hearing, trial counsel testified that he filed twenty-one pretrial motions and eight motions in limine after being retained in September 2010, in an effort to limit the evidence of violence in Petitioner's marriage. *Owens v. State*, 2017 WL 3836022, at *2. Counsel further testified as follows:

> Trial counsel said that the State's position was that the [Petitioner] was "a womanizing wife beater" and that the State's witness list included several of the victim's co-workers, some of whom had had conversations with the victim about the way the Petitioner treated her. In an effort to block this evidence, trial counsel filed several pretrial motions regarding what the witnesses could say. Counsel said that "there were multiple issues that [they] continually dealt with up until the trial date."
>
> Trial counsel said that he tried to limit Deputy Ward's testimony and acknowledged that he should have objected to Deputy Ward's testifying about leaving a victim's rights form with the victim [in 2003]. However, regarding objections, counsel noted: "You get into the issue of the witness starts that flow and you cut them off and object, and when you do that, does that really cause the jury to pay more attention to what's being done ... or do you just let it on in and try to move on and maybe it doesn't attract a lot of attention[.]"
>
> Trial counsel said that he did not object to Ms. McKey's statement because he did not "want to draw any attention to it and was hoping that the jury might not be paying that much of attention to her." Counsel again explained the numerous pretrial motions he filed in an effort to keep out any evidence of abuse. In trial counsel's opinion, Ms. McKey's testimony did not warrant a mistrial, and a sidebar conference could have resulted in the trial court's issuance of a cautionary instruction to the jury, which could have caught the jury's attention.

*Id.* at 2–3.

### III. CLAIMS PRESENTED FOR REVIEW

Petitioner's pro se petition in this Court raises the following claims:

(1) The trial court erred in (a) admitting testimony that he had threatened to kill the victim shortly before her death; (b) admitting testimony that repeated the victim's statements about her excitement over her son's wedding and her concerns over Petitioner's infidelity to her; (c) allowing the state on redirect examination of the victim's daughter to exceed the scope of the witness's

cross-examination, in order to elicit testimony that Petitioner was the sole recipient of money and personal belongings following the victim's death; and (d) admitting testimony about the victim's previous bruises.

(2) The evidence is insufficient to support his conviction.

(3) The trial court abused its discretion in sentencing Petitioner to twenty years in prison.

(4) Trial counsel was constitutionally ineffective in failing to object to witness testimony concerning previous acts of domestic violence.

(Doc. No. 1 at 15, 17–47.)

## IV. LEGAL STANDARD

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Upon finding a constitutional error on habeas corpus review, a federal court may only grant relief if it finds that the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Peterson v. Warren*, 311 F. App'x 798, 803–04 (6th Cir. 2009).

AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases . . . and 'to further the principles of comity, finality, and federalism.'" *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 436 (2000)). AEDPA's requirements "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." *Uttecht v. Brown*, 551 U.S. 1, 10 (2007) (citations omitted). As the Supreme Court has explained,

AEDPA's requirements reflect "the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)). Where state courts have ruled on a claim, AEDPA imposes "a substantially higher threshold" for obtaining relief than a de novo review of whether the state court's determination was incorrect. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).

Specifically, a federal court may not grant habeas relief on a claim rejected on the merits in state court unless the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (d)(2). A state court's legal decision is "contrary to" clearly established federal law under Section 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 412–13. An "unreasonable application" occurs when "the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. A state court decision is not unreasonable under this standard simply because the federal court finds it erroneous or incorrect. *Id.* at 411. Rather, the federal court must determine that the state court's decision applies federal law in an objectively unreasonable manner. *Id.* at 410–12.

Similarly, a district court on habeas review may not find a state court factual determination to be unreasonable under Section 2254(d)(2) simply because it disagrees with the determination;

rather, the determination must be "'objectively unreasonable' in light of the evidence presented in the state court proceedings." *Young v. Hofbauer*, 52 F. App'x 234, 236 (6th Cir. 2002). "A state court decision involves 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding' only if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007) (quoting Section 2254(d)(2) and (e)(1)); *but see McMullan v. Booker*, 761 F.3d 662, 670 & n.3 (6th Cir. 2014) (observing that the Supreme Court has not clarified the relationship between (d)(2) and (e)(1) and the panel did not read *Matthews* to take a clear position on a circuit split about whether clear and convincing rebutting evidence is required for a petitioner to survive (d)(2)). Moreover, under Section 2254(d)(2), "it is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011).

The standard set forth in 28 U.S.C. § 2254(d) for granting relief on a claim rejected on the merits by a state court "is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Richter*, 562 U.S. at 102, and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). Petitioner bears the burden of proof. *Pinholster*, 563 U.S. at 181.

Even that demanding review, however, is ordinarily only available to state inmates who have fully exhausted their remedies in the state court system. 28 U.S.C. §§ 2254(b) and (c) provide that a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has presented the same claim sought to be redressed in a federal

habeas court to the state courts. *Pinholster*, 563 U.S. at 182; *Kelly v. Lazaroff*, 846 F.3d 819, 828 (6th Cir. 2017) (quoting *Wagner v. Smith*, 581 F.3d 410, 417 (6th Cir. 2009)) (petitioner must present the "same claim under the same theory" to the state court). This rule has been interpreted by the Supreme Court as one of total exhaustion, *Rose v. Lundy*, 455 U.S. 509 (1982), meaning that each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. *Picard v. Connor*, 404 U.S. 270 (1971); *see also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review"). Moreover, the substance of the claim must have been presented as a federal constitutional claim. *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996).

The procedural default doctrine is ancillary to the exhaustion requirement. *See Edwards v. Carpenter*, 529 U.S. 446 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. *Wainwright v. Sykes*, 433 U.S. 72, 81–82 (1977*); see also Walker v. Martin*, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment"); *Coleman v. Thompson*, 501 U.S. 722 (1991) (same). If a claim has never been presented to the state courts, but a state court remedy is no longer available (e.g., when an applicable statute of limitations bars a claim), then the claim is technically exhausted, but procedurally barred. *Coleman*, 501 U.S. at 731–32.

If a claim is procedurally defaulted, "federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (citing *Coleman*, 501 U.S. at 754). "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him[;] . . . some objective factor external to the defense [that] impeded . . . efforts to comply with the State's procedural rule." *Coleman*, 501 U.S. at 753 (emphasis in original). Examples of cause include the unavailability of the factual or legal basis for a claim or interference by officials that makes compliance "impracticable." *Id.* To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)); *see also Ambrose v. Booker*, 684 F.3d 638, 649 (6th Cir. 2012) (finding that "having shown cause, petitioners must show actual prejudice to excuse their default"). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000). Likewise, if a petitioner cannot establish prejudice, the question of cause is immaterial.

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392

(2004) (citing *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986)); *accord Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006).

## V. ANALYSIS

### A. Claims of Erroneous Evidentiary Rulings

As to each of Petitioner's claims that the trial court erred in allowing the admission of testimonial evidence, Respondent argues that such claims are not cognizable on federal habeas review, as they assert errors of state law rather than federal constitutional violations. (Doc. No. 12 at 15–17.) Alternatively, Respondent argues that if any such claim can be construed as relying upon the denial of a constitutional right, it should be denied as procedurally defaulted because it was not presented to the state courts on that basis. (*Id.*)

In his petition, Petitioner presents these claims by reference to his brief on direct appeal (Doc. No. 1 at 15, 27), and subsequently argues them without referring to any federal rights. (*Id.* at 27–34.) However, in a catch-all paragraph on the final page of his petition, Petitioner states that "[f]or all grounds alleged in this Petition, Petitioner alleges violations of due process of law, his right to have a fair trial by an impartial jury, his right to cross-examine witnesses, his right to have the effective assistance of counsel, and his right to have equal protection of the laws. (U.S. Const. Am. 5, 6, and 14)." (*Id.* at 47.) In his reply brief, Petitioner argues that his claims of evidentiary error are cognizable here because they either implicate a federal constitutional claim or rely on a state procedural rule which has a nearly identical federal counterpart. (Doc. No. 18 at 2–4.) Specifically, he argues that his claims based on the Tennessee Rules of Evidence imply federal constitutional claims based on the nearly identical Federal Rules of Evidence, which "protect the same Constitutional rights." (*Id.* at 2, 4.)

The Supreme Court has "stated many times that federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (citations and internal quotation marks omitted). While the Court is not impressed with Petitioner's argument that his assertions of error raise federal claims by implication or analogy, it does appear (presuming the sufficiency of his catch-all paragraph) that his petition directly presents the claim that the trial court's erroneous evidentiary rulings resulted in the deprivation of due process and fundamental fairness. (Doc. No. 1 at 47.) This claim is cognizable in habeas, albeit unlikely to win relief. *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003) ("When an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief."); *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988). The Court must therefore determine whether any such claims based on the trial court's evidentiary rulings are properly reviewable here.

In reply to Respondent's assertion of procedural default due to Petitioner's failure to raise his evidentiary claims as federal claims before the state courts, Petitioner argues for the automatic inference of a federal due process claim whenever reversible error is alleged before the Tennessee Court of Criminal Appeals (*id.* at 3) and contends that the de novo review of the trial court's evidentiary rulings by the Court of Criminal Appeals presented "the opportunity to analyze the claims under [the federal constitution,] but [that the appellate court] failed to do so." (*Id.* at 4.) Petitioner further argues that his appellate brief cited and attached a state court decision, *State v. Carter*, No. M2009-02399-CCA-R3-CD, 2010 WL 5343212 (Tenn. Crim. App. Dec. 16, 2010), which cited Federal Rules of Evidence and federal cases and therefore placed the Court of Criminal Appeals on notice that Petitioner was invoking his federal constitutional rights. (Doc. No. 18 at 3.)

In order to have properly exhausted a federal habeas claim, the substance of the claim must have been presented to the state courts as a federal constitutional claim. *Gray v. Netherland*, 518

U.S. 152, 162–63 (1996). "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (citations omitted). Rather, "the legal and factual basis of the claim must be 'fairly presented' to the state courts so that they have an opportunity to remedy the alleged constitutional violation." *Arnold v. Warden, Lebanon Corr. Inst.*, 832 F. Supp. 2d 853, 860 (S.D. Ohio 2011) (citing *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006)).

"Ordinarily, a federal claim is not 'fairly presented' to a state court if that court must read beyond the filings to alert it to such a claim." *Id.* (citing *Baldwin v. Reese*, 541 U.S. 27, 31–32 (2004)). Thus, a habeas petitioner's filing before a state court may be deemed to fairly present a federal claim if:

> 1) the petitioner phrased the federal claim in terms of the pertinent constitutional law or in terms sufficiently particular to allege a denial of the specific constitutional right in question; 2) the petitioner relied upon federal cases employing the constitutional analysis in question; 3) the petitioner relied upon state cases employing the federal constitutional analysis in question; or 4) the petitioner alleged facts well within the mainstream of the pertinent constitutional law.

*Hicks v. Straub*, 377 F.3d 538, 553 (6th Cir. 2004) (citation and internal quotation marks omitted), *abrogated on other grounds by Guilmette v. Howes*, 624 F.3d 286 (6th Cir. 2010).

Here, despite his arguments to the contrary, Petitioner clearly presented his evidentiary arguments to the state courts under state law exclusively. (*See* Doc. No. 10-24.) These state law claims are, at best, "somewhat similar" to claims that could have been raised under the federal constitution but were not. *Anderson*, 459 U.S. at 6. Petitioner cannot demonstrate otherwise by drawing an analogy *in this Court* between his claim of improper admission of character evidence under state evidentiary rules and a potential claim under federal evidentiary rules or (looking behind those rules) a claim of fundamental unfairness implicating due process, when he did not present the claim in this way to the state courts. *Duncan v. Henry*, 513 U.S. 364, 366 (1995) ("If a

habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court."); *Kelly v. Lazaroff*, 846 F.3d 819, 828 (6th Cir. 2017) (quoting *Wagner v. Smith*, 581 F.3d 410, 417 (6th Cir. 2009)) (to exhaust, petitioner must present the "same claim under the same theory" to the state court). While Petitioner concluded one paragraph of his brief before the Tennessee Court of Criminal Appeals with the statement that the admission of testimony about bruises resembling fingerprints around the victim's neck inflamed the jury and prejudiced his "right to a fair and impartial trial" (Doc. No. 10-24 at 36), this one statement did not lead the court to analyze the issue under federal constitutional standards, and will not suffice to fairly present a claim that he was denied his federal due process right to a fundamentally fair trial. *See Duncan*, 513 U.S. at 366 (holding that federal claim was not fairly presented where state court was not apprised of claim under 14th Amendment, and so "analyzed the evidentiary error by asking whether its prejudicial effect outweighed its probative value, not whether it was so inflammatory as to prevent a fair trial").

Petitioner attempts to argue that his state appellate brief raised issues of federal constitutional law when it cited and attached *State v. Carter*, No. M2009-02399-CCA-R3-CD, 2010 WL 5343212 (Tenn. Crim. App. Dec. 16, 2010). But that case was not cited as support for the applicability of federal constitutional analysis to Petitioner's argument on appeal (*see* Doc. No. 10-24 at 21–22), nor did that case refer to federal authority in anything more than a tangential way. *See Carter*, 2010 WL 5343212, at *13–14. In short, Petitioner's only properly exhausted claims with regard to the trial court's evidentiary rulings are state-law claims which this Court may not review. Petitioner's due process claim before this Court was not presented before the state courts, and his inability to do so now results in its exhaustion by procedural default. *Gray*, 518 U.S. at

161–63; *Landrum v. Mitchell*, 625 F.3d 905, 918 (6th Cir. 2010). Petitioner does not allege any basis for finding cause excusing this default. The Court is therefore barred from further consideration of any claim that the trial court's evidentiary errors deprived Petitioner of his federal due process rights. *Coleman*, 501 U.S. at 750.

Even if these claims had not been defaulted, Petitioner's salient contention based on the trial court's evidentiary rulings—namely, that his due process right to a fundamentally fair trial was violated by the admission of evidence of prior bad acts—would not warrant habeas relief. As the Sixth Circuit held in *Bugh v. Mitchell*,

> There is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence. In *Estelle v. McGuire*, the Supreme Court declined to hold that the admission of prior injury evidence violated due process, thus warranting habeas relief. 502 U.S. 62, 75, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). The Court stated in a footnote that, because it need not reach the issue, it expressed no opinion as to whether a state law would violate due process if it permitted the use of prior crimes evidence to show propensity to commit a charged crime. *Id.* at 75 n. 5, 112 S.Ct. 475. Moreover, in *Spencer v. Texas*, 385 U.S. 554, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967), the Supreme Court rejected the argument that the Due Process Clause requires the exclusion of prejudicial evidence, even though limiting instructions were given and a valid state purpose is served. *Id.* at 563-64, 87 S.Ct. 648. The Court recognized that it was not "a rule-making organ for the promulgation of state rules of criminal procedure. And none of the specific provisions of the Constitution ordains this Court with such authority." *Id.* at 564, 87 S.Ct. 648. While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997); *Huddleston v. United States*, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988), it has not explicitly addressed the issue in constitutional terms. Accordingly, the district court correctly found that there is no Supreme Court precedent that the trial court's decision could be deemed "contrary to," under AEDPA.

*Bugh*, 329 F.3d at 512–13. *See also Friday v. Straub*, 175 F. Supp. 2d 933, 937 (E.D. Mich. 2001) (citing *Dowling v. United States*, 493 U.S. 342, 352–53 (1990)) ("The Supreme Court has declined to hold that similar act evidence is so extremely unfair that its admission violates fundamental conceptions of justice."). In addition, as the Court of Criminal Appeals found, though the evidence

of other bad acts was not admissible solely to show Petitioner's propensity to commit the charged offense, it was properly weighed and allowed by the trial court because the jury had to decide whether the victim's death was a suicide or a homicide, and the evidence indicated a "settled purpose" to harm the victim. *State v. Owens*, 2014 WL 1173371, at *15, 22.

In sum, Petitioner is not entitled to habeas relief on his claims based on allegedly erroneous evidentiary rulings.

## B. Sufficiency of the Evidence Claim

Petitioner next claims that the evidence at trial was insufficient to sustain his conviction. (Doc. No. 1 at 15, 34–36.) He bases this claim on his contentions that (1) there was no proof that the gun he possessed was in fact new; (2) the victim's medications provided better circumstantial evidence of her death by suicide than Petitioner's violent history did of her death by homicide; (3) the likelihood of the victim's suicidal thoughts due to medication side effects was not opposed by any expert testimony, but only by lay witness testimony about her excitement for her son's upcoming wedding; (4) Dr. Li's testimony that the victim's wounds were in a location and at an angle rarely seen in suicide cases, and that the gun was heavy and difficult to hold, makes suicide more rather than less likely; and (5) law enforcement tainted the evidence by failing to follow protocol before opening the gun cartridge. (*Id.* at 34–36.)[2]

As noted by the Tennessee Court of Criminal Appeals in addressing this claim, *State v. Owens*, 2014 WL 1173371, at *23, the governing standard when the sufficiency of the evidence supporting a conviction is questioned on appeal is "whether, after viewing the evidence in the light

---

[2] To the extent that any of these grounds underlying Petitioner's sufficiency of the evidence claim were not presented to the Tennessee Court of Criminal Appeals, he has procedurally defaulted the claim upon those grounds. *See Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998) ("Petitioner's second ineffective assistance claim rests on a theory which is separate and distinct from the one previously considered and rejected in state court. … [W]e find that she has procedurally defaulted this claim.").

most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In accord with this standard, "a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Cavazos v. Smith*, 565 U.S. 1, 6 (2011) (quoting *Jackson*, 443 U.S. at 326).

The Supreme Court has "made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012). First, because it is the responsibility of the jury, not the court, to decide what conclusions should be drawn from the evidence, the reviewing state court on direct appeal "may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Id.* (quoting *Cavazos*, 565 U.S. at 2). Second, a federal habeas court "may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court," but may only do so if the state court's decision was objectively unreasonable. *Id.*

Here, the Tennessee Court of Criminal Appeals concluded that the evidence was sufficient for the jury to find Petitioner guilty as charged:

> Owens argues that the evidence is insufficient to support his conviction for second degree murder because the proof does not establish that he knowingly killed his wife. In support of this argument, he asserts that: (1) the medical examiner was unable to determine whether the victim's manner of death was homicide or suicide; (2) the results of the victim's gunshot residue test were inconclusive; (3) no identifiable fingerprints were found on the gun; (4) no DNA evidence connected him to his wife's death; (5) the results of the fiber analysis test did not connect him to his wife's death; (6) the victim had been taking medications with warnings about a possible increased risk for suicidal thoughts and behaviors; (7) the jury heard inadmissible evidence from several witnesses, as previously discussed; and (8) Detective Hardy's method of inspecting the gun was "suspect and inconsistent with the method described by expert witnesses Scott and Brundage[.]" . . .

We conclude that the evidence, though circumstantial, is sufficient to sustain Owens's conviction for second degree murder. Holder testified that the Friday before the victim's death, she overheard Owens threaten to kill the victim with his new .357 revolver. Journey, a former neighbor, testified that she called the police after witnessing a physical altercation between Owens and the victim. Deputy Ward, who responded to Journey's call about the domestic disturbance between Owens and the victim, testified that he saw that the victim had sustained injuries to her mouth, lip, face, and wrist when he arrived at their residence. Cotton, Brown, McKey, and Powell, the victim's co-workers, testified that the victim had a violent, unstable relationship with Owens and that they had observed bruises on the victim in the past. Brown, McKey and Powell testified that they had advised the victim to leave Owens several times.

The defense theory at trial was that the victim had committed suicide. Although Owens argues on appeal that some of the evidence at trial supported his defense of suicide, we conclude that there was more than sufficient evidence to support the State's theory that Owens knowingly shot and killed the victim. We note that it is the jury's duty to resolve conflicts in the evidence. *See Odom*, 928 S.W.2d at 23. Despite the fact that there was conflicting evidence regarding whether the victim committed suicide, the jury rejected the defense's theory of suicide in favor of the State's theory that Owens had knowingly killed his wife. We will not second-guess the jury's decision because there is sufficient evidence to sustain the verdict.

Much of the evidence presented at trial indicated that the victim's death was the result of a homicide rather than a suicide. Brown, McKey, Powell, and Loudermilk testified that the victim was very excited about her son's wedding, was planning on attending the ceremony in Florida, and had been shopping for a dress to wear. Brown testified that the victim did not appear depressed shortly before her death. McKey stated that the victim had told her that Owens had been unfaithful on more than one occasion and that she had decided to confront Owens about his most recent infidelity the Friday before her death. Powell stated that the victim was unhappy about the fact that Owens currently had a girlfriend but that Owens had been unfaithful several times in the past and the victim had never talked about committing suicide. She also stated that the victim intended to confront Owens about his infidelity the weekend of her death. Loudermilk stated that her mother had never mentioned suicide to her. She asserted that although her mother had been treated by an orthopedist for arthritis and joint problems, the pain associated with these conditions was not enough to keep her mother from doing her daily activities and working at her job.

Moreover, although the results from Owens's gunshot residue test were not processed because the kit used did not meet TBI protocols, Officer Daniels and paramedic Ronald Butrum testified that they witnessed Owens repeatedly washing his hands, and Agent Hodge testified that a person could remove gunshot residue by washing his hands. Carol Wright, the human resources director at the victim's

company, testified that approximately one week after the victim's death, Owens asked her if the victim had a life insurance policy and inquired about the amount of the policy and the beneficiary of the policy. She stated that he received $62,000 from the victim's life insurance policy and all of the funds in the victim's 401(k). Loudermilk testified that Owens was the only person to receive any money from the victim's bank accounts, life insurance, and 401(k) accounts after the victim's death.

The medical evidence also indicated that suicide was unlikely. Although Dr. Li testified that he could not conclusively determine the victim's manner of death, he stated that gunshot wounds in suicides are typically on the forehead, the temple, or sometimes inside the mouth and that wounds on other parts of the head were "very rarely" seen in suicides. He also stated that the victim's wounds in this case were unusual because of the location of the wounds and the direction of the bullet path. Finally, Dr. Li opined that the weapon found at the scene, which was heavy, would have been difficult for the victim to hold to produce the type of injury she suffered.

Furthermore, the revolver provided strong evidence that the victim's death was a homicide. Agent Scott, Detective Hardy, and Officer Daniels all testified that the spent cartridge would have been underneath the hammer of the revolver if the victim had fired a single, self-inflicted gunshot. Although Owens presented the theory that the improper handling of the revolver at the crime scene affected the position of the fired cartridge, it was the jury's duty to evaluate the credibility of witnesses, to determine the weight given to testimony, and to resolve all conflicts in the evidence. *See Odom*, 928 S.W.2d at 23. For this reason, we will not "reweigh or reevaluate the evidence." *Henley*, 960 S.W.2d at 578–79. Based on this evidence, a reasonable jury could have concluded that Owens knowingly killed the victim with his .357 revolver. Therefore, we conclude that the proof is sufficient to sustain Owens's conviction for second degree murder.

*State v. Owens*, 2014 WL 1173371, at *23, 24–26.

Viewing these findings through the lens of AEDPA, it is clear that the Tennessee Court of Criminal Appeals correctly applied *Jackson* and reached a conclusion that was reasonable in light of the evidence presented at Petitioner's trial. Specifically, the court reasonably concluded that, regardless of the presence of some evidence which would support Petitioner's theory of suicide, there was more than sufficient evidence for a rational juror to find that he knowingly killed the victim, including physical evidence and both lay and expert testimony that indicated that suicide was unlikely.

Given the physical evidence and testimony presented, a rational juror could find that Petitioner was guilty of the charged offense. The state court's determination that the evidence was sufficient to support a finding of guilt beyond a reasonable doubt was certainly not "objectively unreasonable," and Petitioner has not met the high bar to overcome that determination in a federal habeas proceeding. *See Coleman*, 566 U.S. at 651; *see also Quintero v. Carpenter*, 2014 WL 7139987, at *33 (M.D. Tenn. Dec. 12, 2014) ("[E]ven were we to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable."). Petitioner is not entitled to relief on this claim.

## C. Excessive Sentence Claim

Petitioner claims that his 20-year sentence is excessive, based on the fact that "[t]he trial court's only enhancement factor that increased Petitioner's sentence from 15 years to 20 years was the defendant's employment of a firearm," and the enhancement was erroneously applied "because the weapon was an essential element of the 'knowing' alleged killing, and was not allowed to be used by the trial court [under] T.C.A. 40-35-114[.]" (Doc. No. 1 at 36.) This claim of error in the application of the state sentencing scheme is not cognizable on federal habeas review. *See Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (reversing circuit court decision requiring state trial court to reconsider sentencing determination in compliance with state law). "[I]t is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts." *Id.* (emphasis in original). The Supreme Court "ha[s] repeatedly held that 'federal habeas corpus relief does not lie for errors of state law,'" and has admonished that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Id.* (quoting *Estelle v. McGuire*, 502 U.S. at 67–68).

In *Villasana v. Steward*, No. 3:13-cv-00596, 2014 WL 1883938 (M.D. Tenn. May 12, 2014), this Court found habeas relief unavailable in the sentencing context, dismissing as noncognizable the petitioner's claim that the state court sentenced him unlawfully because it misapplied an enhancement factor under Tenn. Code Ann. § 40-35-114. *Id.* at *8–9. The claim in *Villasana* is indistinguishable from Petitioner's claim of sentencing error here, and the same result obtains. Petitioner is not entitled to relief on this claim.

### D. Ineffective Assistance of Counsel Claim

Petitioner claims that he was deprived of the effective assistance of counsel when trial counsel failed to object to the admission of testimony from Deputy Don Ward and Ms. Melba McKey concerning prior evidence of domestic violence. (Doc. No. 1 at 39–44.) He claims that "[t]he inadmissible testimony that defense counsel failed to object to was the only evidence that jurors could have used to convict [Petitioner] of Second Degree Murder." (*Id.* at 40.) Respondent concedes that these appear to be "the same grounds of ineffective assistance that Petitioner exhausted in state court." (Doc. No. 12 at 23.)

As Respondent further acknowledges, after hearing counsel's pretrial motions, the trial court excluded testimony about the victim's statements to sheriff's deputies on the night of June 22, 2003, that Petitioner had assaulted her, but permitted Deputy Ward to testify about his personal observations that night, including the victim's injuries. (Doc. No. 10-31 at 7.) With respect to Ms. McKey, the trial court issued a pretrial ruling that any testimony repeating the victim's statement that Petitioner had choked her was inadmissible, but that Ms. McKey could testify about her personal observations, including the presence of bruises on the victim's neck. (*Id.* at 9–10.)

At trial, Deputy Ward testified that, based on his conversation with or observation of the victim that night in 2003, he left a Victim's Rights Form with her. (*Id.* at 14.) Deputy Ward then

read the contents of the form into the record. (*Id.*) Ms. McKey testified that the victim came into work with "bruises on her neck and arm," that the bruises on her neck were like fingerprints, and that "she said that he had choked her." (*Id.* at 18.) Both witnesses were reminded that they could not testify as to what the victim told them. (*Id.* at 14; Doc. No. 10-9 at 147.) Petitioner argues that counsel was ineffective in failing to object to the testimony of these witnesses which flies in the face of the trial court's pretrial exclusionary rulings. (Doc. No. 1 at 40–42.)

The U.S. Supreme Court has established a two-part test to evaluate whether counsel has been constitutionally ineffective. *Strickland v. Washington*, 466 U.S. 668, 685–86 (1984). This test requires the petitioner to prove (1) that counsel's performance fell below an objective standard of reasonableness and (2) that, but for counsel's deficient representation, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688–89, 694. The *Strickland* standard sets a high bar that is not easily surmounted. *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

The Tennessee Court of Criminal Appeals applied *Strickland* to Petitioner's claim of ineffective assistance, affirming the post-conviction trial court's finding that counsel's failure to object was not deficient performance under *Strickland*, but was a matter of strategy:

> Trial counsel said that he tried to limit Deputy Ward's testimony and acknowledged that he should have objected to Deputy Ward's testifying about leaving a victim's rights form with the victim. However, regarding objections, counsel noted: "You get into the issue of the witness starts that flow and you cut them off and object, and when you do that, does that really cause the jury to pay more attention to what's being done ... or do you just let it on in and try to move on and maybe it doesn't attract a lot of attention[.]"
>
> Trial counsel said that he did not object to Ms. McKey's statement because he did not "want to draw any attention to it and was hoping that the jury might not be paying that much of attention to her." Counsel again explained the numerous pretrial motions he filed in an effort to keep out any evidence of abuse. In trial counsel's opinion, Ms. McKey's testimony did not warrant a mistrial, and a sidebar conference could have resulted in the trial court's issuance of a cautionary instruction to the jury, which could have caught the jury's attention. . . .

The record fully supports the findings and conclusions of the post-conviction court [that counsel was not ineffective]. Trial counsel testified that because he knew the State's position would be to portray the Petitioner as a "womanizing wife beater," he filed numerous pretrial motions in an effort to keep out such testimony. Counsel relied upon his experience in determining whether to object to witnesses' testimony, explaining that sometimes it was better to remain silent than to draw the jury's attention to it. In sum, the Petitioner has failed to meet his burden of demonstrating that he was denied the effective assistance of trial counsel.

*Owens v. State*, 2017 WL 3836022, at *3–4.

A petitioner seeking to prove ineffective assistance "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (citation and internal quotation marks omitted). Petitioner vehemently disagrees with the appropriateness of counsel's strategy of failing to object, going so far as to question whether the citation of "strategy" is really a post hoc rationalization for counsel's deficient performance. (Doc. No. 1 at 41–43.) Petitioner cites his trial counsel's testimony that he declined to object to Ms. McKey's testimony as a matter of strategy, but that he could not recall his thought process regarding his response to Deputy Ward's testimony. (*Id.* at 43–44.)

"Concerning the failure to object to inadmissible evidence, 'the Constitution does not insure that defense counsel will recognize and raise every conceivable constitutional claim.'" *United States v. Dado*, 759 F.3d 550, 566 (6th Cir. 2014) (quoting *Lundgren v. Mitchell*, 440 F.3d 754, 774 (6th Cir. 2006)). "Learned counsel . . . use objections in a tactical manner. In light of this, any single failure to object usually cannot be said to have been error unless the evidence sought is so prejudicial to a client that failure to object essentially defaults the case to the state." *Lundgren*, 440 F.3d at 774. Here, despite Petitioner's remonstrations, it is clear that strategic considerations informed counsel's reaction to the testimony at issue, and that allowing these discrete testimonial statements to pass without objection in the course of a four-day trial did not in any way "essentially

default[] the case to the state." *Id.* As discussed above, the evidence—including at least five other witnesses' testimony that indicated a physically abusive and threatening relationship—was more than sufficient to support Petitioner's conviction, with or without the testimony at issue here.

Accordingly, the state courts' decision that trial counsel did not render ineffective assistance is not contrary to, or an unreasonable application of, the clearly established rule of *Strickland*, nor is it based on an unreasonable determination of the facts in light of the evidence presented in state court proceedings. Habeas relief is therefore not warranted.

**E. No Certificate of Appealability Shall Issue**

When the district court denies a ground for relief on the merits in a habeas corpus action, a certificate of appealability (COA) "may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the standard being whether "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Because Petitioner has not made a substantial showing of the denial of a constitutional right with respect to any ground for relief asserted in the petition, a COA will not issue.

## VI. CONCLUSION

For the foregoing reasons, the habeas corpus petition will be denied and this matter will be dismissed with prejudice.

An appropriate Order is filed herewith.

WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE